## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
### (St. Louis Division)

| | | |
|---|---|---|
| **NEW YORK STUDIO, INC.,** | ) | |
| | ) | |
| **ATLAS INTELLECTUAL PROPERTIES, LLC,** | ) | |
| | ) | |
| **and** | ) | |
| | ) | |
| **RISE OF THE PHOENIX, INC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. _____** |
| | ) | |
| **THE BETTER BUSINESS BUREAU** | ) | **(JURY TRIAL DEMANDED)** |
| **OF GREATER ST. LOUIS, INC.,** | ) | |
| Michelle L. Corey, President, CEO, and R/A | ) | |
| 15 Sunnen Drive, Ste. 107 | ) | |
| St. Louis, MO  63143 | ) | **(SERVE BY PRIVATE PROCESS)** |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiffs New York Studio, Inc., Atlas Intellectual Properties, LLC, and Rise of the Phoenix, Inc. (hereinafter collectively referred to as the "Plaintiffs" or "NYS") requests judgment and damages from Defendant The Better Business Bureau of Greater St. Louis, Inc. (the "St. Louis BBB" or "Defendant").

## PARTIES

1.      New York Studio, Inc. is a Delaware corporation, which trades under the business name "T*h*e" and is in the business of organizing modeling and acting events nationwide.  New York Studio, Inc. is a non-exclusive licensee of Atlas Intellectual Properties, LLC.

2.      Atlas Intellectual Properties, LLC is a Delaware limited liability company that owns the rights to the "T*h*e" trademark, brand, and related intellectual property assets, and which

receives licensing fees from the use of that trademark by New York Studio, Inc. and Rise of the Phoenix, Inc.

3.      Rise of the Phoenix, Inc. is a Delaware corporation, which trades under the business name "T*he*" and is in the business of organizing modeling and acting events nationwide.  Rise of the Phoenix, Inc. is a non-exclusive licensee of Atlas Intellectual Properties, LLC and is also a franchisor of the "T*he*" brand.

4.      The St. Louis BBB is a Missouri non-profit corporation that is a local franchise of the Council of Better Business Bureaus, Inc. (a Delaware corporation).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

6.      This Court has personal jurisdiction over the St. Louis BBB because the St. Louis BBB is a Missouri corporation with a principal place of business in this judicial district.

7.      Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(a).

## ALLEGATIONS OF FACT

8.      NYS is engaged in the business of organizing the acting and modeling events nationwide under the "T*he*" brand.  "T*he*" events are performance-based talent competitions that represent a wholesome, fun and family-oriented way to expose children to certain aspects of the entertainment business.  The children are provided with an opportunity to meet and perform for representatives from in the entertainment industry, and each participant gets their chance to shine, just as people auditioning for TV shows like "American Idol" or "America's Got Talent" are provided an opportunity to showcase their talents.

9.      On August 1, 2009, New York Studio, Inc. purchased the "T*he*" trade name, trademarks, business goodwill, and other business assets related to the "T*he*" modeling and acting event organization business from NedGam Productions, LLC, a Nevada limited liability company.

10.     The managing member of NedGam Productions is George Gammon, who is also the managing member of another Nevada limited liability company, DGS Productions, LLC, which trades under the names "ACT" and "Academy of Cinema and Television."  Therefore, prior to August 1, 2009, the companies trading as "ACT" and "T*he*"—although distinct entities—had common ownership.

11.     New York Studio, Inc., Rise of the Phoenix, Inc. and Atlas Intellectual Properties, LLC are owned by Michael Palance, who is the sole shareholder or sole member of those entities.

12.     Neither New York Studio, Inc., Rise of the Phoenix, Inc., nor Atlas Intellectual Properties, LLC has any ownership interest in NedGam Productions or DGS Productions, and they have never had any ownership interest in these companies.

13.     Neither NedGam Productions nor DGS Productions has any ownership interest in New York Studio, Inc., Rise of the Phoenix, Inc., or Atlas Intellectual Properties, LLC, and they have never had any ownership interest in NYS.

14.     Michael Palance does not have any ownership interest in NedGam Productions or DGS Productions, and he has never had any ownership interest in these companies.

15.     Since purchasing the "T*he*" brand and business assets in August 2009, NYS has invested significant resources in developing a nationwide reputation for providing aspiring

young models and actors with a rare opportunity to perform live at a family friendly event which takes place at the Walt Disney World Swan and Dolphin Hotel.

16.     In November 2010, Atlas Intellectual Properties, LLC purchased the "T*he*" trademarks, brand, and other intellectual property and business goodwill related to "T*he*" from New York Studio, Inc., granting New York Studio, Inc. a license to continue using those trademarks and intellectual property.

17.     Also in November 2010, Atlas Intellectual Properties, LLC entered into a franchise and intellectual property licensing agreement with Rise of the Phoenix, Inc. related to "T*he*."

18.     Neither NYS nor the "T*he*" business are currently or ever have been engaged in the business of offering or providing modeling agency or talent agency services or acting school services.

19.     Since purchasing the "T*he*" brand and business assets in August 2009, NYS has invested significant resources in improving T*he*'s reputation, which suffered from some negative publicity prior to the purchase related to a few consumer complaints and an early 2009 investigation by the Connecticut Attorney General regarding some contractual provisions in one of NedGam Productions' agreements.

The Phoenix BBB's "Business Reliability Report"

20.     Between August 1, 2009 and late August or early September 2010, The Better Business Bureau, Inc. (the "Phoenix BBB"), another local franchise of the Council of Better Business Bureaus, Inc, published on its website a single "Business Reliability Report" for ACT, which falsely stated that "T*he*" is a fictitious business name of ACT and that "T*he*" is a drama instruction school.

21.     During this time, if any consumer or business affiliate of "T*he*" searched for "T*he*" on any of the Better Business Bureau's national or regional websites, they were directed to the aforementioned "Business Reliability Report" published by the Phoenix BBB.

22.     This "Business Reliability Report" falsely stated or falsely implied that there had been thirty-nine (39) consumer complaints filed against "T*he*" in the past thirty-six (36) months (as of August 2010), twenty (20) of which were "serious complaints."

23.     This is false and misleading because only a few of these complaints were actually filed against "T*he*"; the remainder were filed against the numerous other entities falsely grouped as fictitious names on the "Business Reliability Report."

24.     The "Business Reliability Report" is also false and misleading because "T*he*" is not a drama instruction school.

25.     Despite actual knowledge of the falsity of the "Business Reliability Report," the Phoenix BBB continued to publish the false report on its website through late August or early September 2010.

26.     The Phoenix BBB has disseminated the false report to the St. Louis BBB, as well as other regional BBBs.

27.     On information and belief, the Council of Better Business Bureaus, Inc., national franchisor to the regional BBBs, induced, facilitated, and conspired in the aforementioned re-dissemination of the false information between regional BBBs through its nationwide information sharing network.

<u>The St. Louis BBB's Republication</u>

28.     On information and belief, the St. Louis BBB has engaged in a pattern of republication of the Phoenix BBB's false statements, from August 2009 through the present.

29.     Although there is not a separate "Business Reliability Report" issued for "T*he*" by the St. Louis BBB, it has made numerous knowingly false republications of the Phoenix BBB's false statements to both consumers and the media.

30.     These republications were intentionally timed to coincide with planned "T*he*" events in the St. Louis area.

31.     In August 2010, just before a scheduled "T*he*" event in Chesterfield, Missouri, the St. Louis BBB affirmatively issued press releases and reached out to local media repeating the Phoenix BBB's falsehoods about the number of complaints against "T*he*" and its purported affiliation with ACT.

32.     In August 2010, when consumers called the St. Louis BBB to inquire about the upcoming "T*he*" event in Chesterfield, Missouri, representatives of the St. Louis BBB told the consumers, "Leave your wallet at home."

<u>The Effects of the False Statements</u>

33.     Since August 2009, numerous "T*he*" customers who had already willingly entered into an agreement to attend a "T*he*" event have contacted "T*he*" seeking to cancel their contract and asking for a full refund based solely on hearing about the contents of the Phoenix BBB's "Business Reliability Report," as republished by the St. Louis BBB, either directly to consumers or via local or national media outlets.

34.     Since August 2009, attendance at "T*he*" events nationwide has decreased markedly as a direct result of the Defendant's defamatory statements and re-publication of those statements.

35.     Since August 2009, two of the Hollywood casting directors that regularly attended "T*he*" events have expressed concern about continuing their long and fruitful relationship with

"T*he*" because of the negative publicity that is being generated by the Phoenix BBB and the St. Louis BBB.  As a direct result of the negative publicity, these casting directors have asked NYS to refrain from using their names in connection with "T*he*" promotional materials.

36.     Since August 2009, two of the venues that have regularly hosted "T*he*" events in the past have refused to host additional events, causing the cancellation of a planned "T*he*" event.

## COUNT I:  DEFAMATION

37.     The allegations in paragraphs 1 through 36 are re-alleged and incorporated by reference as if fully set forth herein.

38.     The statements made by the St. Louis BBB after August 1, 2009 that (1) "T*he*" is the same company or is affiliated with ACT; (2) there have been thirty-nine (39) consumer complaints filed against "T*he*" in the past thirty-six (36) months (as of August 2010), twenty (20) of which were "serious complaints"; and/or (3) "T*he*" is an acting and modeling agency (collectively, the "False Statements") are false, and the facts underlying those statements are false.

39.     The False Statements are of, or concerning, NYS d/b/a "T*he*."

40.     The False Statements have harmed and continue to harm the reputation of NYS, lower the company in the estimation of its consumers and business partners, and deter consumers and business partners from doing business with and associating with NYS.

41.     The St. Louis BBB has published the False Statements to actual and potential consumers of NYS, as well as to local and national media outlets.

42.     The St. Louis BBB made the False Statements with actual malice, existing at the time the False Statements were made, with a wanton and willful disregard of the rights of NYS,

and with a reckless indifference to and a reckless disregard of the truth or falsity of those statements.

43.     The False Statements constitute a substantial danger to NYS's reputation and prejudice NYS in its profession or trade, as they are allegations of unfitness to carry on a business or profession.

44.      The False Statements are actionable *per se*, and as such, require no proof of actual injury to be actionable.

45.     In addition, NYS has suffered actual injury in this case because the False Statements induced actual customers to seek cancellation of their contracts, potential customers to avoid doing business with NYS, and business partners to refuse to continue in their business relationship with NYS.

46.     NYS has invested time and resources to counter the False Statements and rehabilitate its professional reputation.

47.     These actual damages from the False Statements total at least $15,000,000.

WHEREFORE, the Plaintiff prays that this Court, with respect to Count I:  (i) enter a judgment in favor of the Plaintiff and against the St. Louis BBB; (ii) award the Plaintiff FIFTEEN MILLION DOLLARS ($15,000,000) in actual compensatory and consequential damages; (iii) award the Plaintiff SIXTY MILLION DOLLARS ($60,000,000) in punitive damages; (iv) order the St. Louis BBB to pay the Plaintiff's costs and expenses of the suit; and (v) grant such further and general relief as the Court may find warranted.

## COUNT II:  TORTIOUS INTERFERENCE WITH CONTRACT AND/OR BUSINESS EXPECTANCY

48.     The allegations in paragraphs 1 through 47 are re-alleged and incorporated by reference as if fully set forth herein.

49.     There was an existing business relationship between NYS and numerous customers who had already contracted to attend a "T*he*" event at the time the St. Louis BBB made the False Statements or at the time that the False Statements were republished other regional BBBs or by the media to these customers.

50.     There was an existing business relationship between NYS and casting directors Paul Weber and Christian Kaplan at the time the St. Louis BBB made the False Statements or at the time that the False Statements were republished by the media to Paul Weber and Christian Kaplan.

51.     There was an existing business relationship between NYS and the Overland Park Convention Center and the Columbus Convention Center at the time the St. Louis BBB made the False Statements or at the time that the False Statements were republished by other regional BBBs or the media to the Overland Park Convention Center and the Columbus Convention Center.

52.     There was the probability of future economic benefit to NYS in its prospective business relationship with the hundreds or thousands of individuals and families who would have attended various "T*he*" events but for the False Statements, as evidenced by the decreased enrollment at such events since August 2009.

53.     The St. Louis BBB knew or should have known about the aforementioned actual and prospective business relationships.

54.     Many of the existing customers who sought to cancel their contracts with "T*he*" because of the False Statements themselves have asserted that, were it not for the False Statements, they would have maintained their business relationship with NYS.

55. Paul Weber and Christian Kaplan, who asked that "T*he*" cease using their names in its promotional materials, themselves have both asserted that, were it not for the False Statements, they would have continued to allow "T*he*" to advertise their affiliation with "T*he*."

56. The Overland Park Convention Center and the Columbus Convention Center, both of which have recently refused to host additional "T*he*" events, themselves have asserted that, were it not for the False Statements, they would have continued their business relationships with "T*he*."

57. The St. Louis BBB intentionally interfered with the aforementioned actual and potential business relationships in making and re-disseminating the False Statements.

58. The False Statements were wanton and malicious defamation; improper under the laws of the State of Missouri.

59. As a result, NYS has been damaged in the amount of at least $15,000,000.

WHEREFORE, the Plaintiff prays that this Court, with respect to Count II:  (i) enter a judgment in favor of the Plaintiff and against the St. Louis BBB; (ii) award the Plaintiff FIFTEEN MILLION DOLLARS ($15,000,000) in actual compensatory and consequential damages; (iii) award the Plaintiff SIXTY MILLION DOLLARS ($60,000,000) in punitive damages; (iv) order the St. Louis BBB to pay the Plaintiff's costs and expenses of the suit; and (v) grant such further and general relief as the Court may find warranted.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on issues so triable.

Respectfully submitted,
NEW YORK STUDIO, INC., ATLAS
INTELLECTUAL PROPERTIES, LLC,
AND RISE OF THE PHOENIX, INC.,
By Counsel


By_____/s/David G. Wasinger_____
          David G. Wasinger #38253MO
          Michael K. Daming #52864MO
          The Wasinger Law Group, P.C.
          1401 S. Brentwood Blvd.
          Magna Place, Suite 550
          St. Louis, MO  63144
          Tel.:  314-961-0400
          Fax.:  314-961-2726
          dwasinger@wasingerlawgroup.com


          David Ludwig
          Dunlap, Grubb & Weaver, PLLC
          199 Liberty St, SW
          Leesburg, VA 20175

          *Attorney for Plaintiffs*